UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                    Case No. 23-20701
                                       Hon. Stephen J. Murphy, III

CONRAD ROCKENHAUS,

                    Defendant.
_____/

**SENTENCING**

BEFORE THE HONORABLE STEPHEN J. MURPHY, III
United States District Chief Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan  48226
Friday, October 17, 2025

APPEARANCES:

For the Plaintiff          CORINNE M. LAMBERT
United States of America:  U.S. Attorney's Office
                           211 West Fort Street
                           Suite 2001
                           Detroit, Michigan 48226
                           313-226-9129

For the Defendant          SANFORD PLOTKIN
Conrad Rockenhaus:         Sanford Plotkin, P.C.
                           30445 Northwestern Hwy.
                           Suite 225
                           Farmington Hills, Michigan 48334
                           248-798-5756

To obtain a certified copy of this transcript, contact:
Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

TABLE OF CONTENTS

Page

SENTENCING:

Comments by the Court...............................3
Allocution by Mr. Plotkin...........................9
Allocution by Defendant Rockenhaus..................15
Allocution by Ms. Lambert...........................16
Further Comments/Sentence by the Court..............24

EXHIBITS

| Identification | Offered | Received |
| --- | --- | --- |
| NONE | | |

Detroit, Michigan

Friday, October 17, 2025

— — —

(Proceedings commenced at 1:12 p.m., all parties present)

THE CLERK: All rise. United States District Court for the Eastern District of Michigan is now in session, the Honorable Chief Judge Stephen J. Murphy, III presiding.

The Court calls criminal matter 23-20701, United States of America versus Conrad Rockenhaus. Date and time is set for sentencing on the supervised release violations.

Counsel, please state your appearances for the record beginning with the government.

MS. LAMBERT: Good afternoon, Your Honor. Corinne Lambert appearing on behalf of the United States.

THE COURT: Welcome.

MR. PLOTKIN: Good afternoon. Sanford Plotkin appearing with Conrad Rockenhaus, Your Honor.

THE COURT: Okay. Welcome to you. Everybody may be seated. Thank you all for being here.

On Tuesday we were in court. Prior to that I had learned, and I think I mentioned when we were together last time, outside of this case there were a number of submissions that had been made by Mr. Rockenhaus and his wife. I -- and then I received a letter in support of his position on

sentencing in the probation violation matter that we were originally here to conduct sentencing on.  And given the fact that I had about an hour to look at the letter from Ms. Rockenhaus and to determine how to handle that in connection with these other submissions that I was aware of, I -- I took an adjournment.  I reflected a little bit on the matter and tried to figure out what to do.  I consulted with the Administrative Office of U.S. Courts' Office of General Counsel and I'm prepared to proceed now.

28 USC Section 455(a), as we all know, mandates that a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  We spoke at some length, maybe a little length, not a lot, but at some -- had some discussion on Tuesday about my impartiality.  Neither side had questioned it to -- to that point or moved for recusal, and indeed no one's moved for recusal of my involvement in this case to date.

I don't think based on all the research that I did that a recusal is warranted here.  Let me go through the -- the background if I could.  Mr. Rockenhaus filed a civil suit against three probation officers who work in the Eastern District of Michigan.  That's Eastern District of Michigan U.S. District Court Case No. 25-12716, civil case.  Shortly after that, Mrs. Rockenhaus, Adrienne, who is Mr. Rockenhaus's wife, filed her own civil suit against the same three probation

officers and an unnamed United States marshal.  That is 25-12736.

I want to say I haven't looked at the pleadings.  I'm generally aware of the -- of the allegations, but I -- I don't have any interest in or knowledge of what's going on in those cases.  I was advised of them and asked whether or not I would recuse myself from hearing those civil cases, and I said yes, I would because my impartiality to hear a civil case involving an individual before me on a probation violation against our -- our U.S. probation officers is something that my partiality would no doubt be in -- in question.  So I'm not going to be involved in any way in the -- in the civil suits.

And then there was a -- a -- a complaint for judicial misconduct filed against me by Mrs. Rockenhaus which I referenced.  That's pending in Cincinnati.  And I received an email, I guess there was a copy of it in the email but I didn't look at it because, you know, when you have parties in -- in cases like this one who have individuals in their families filing complaints against me, it's up to the Sixth Circuit and the judicial council to determine what to do there.  I'm a member of the judicial council, but obviously I'll be disqualified from participation in resolving that judicial complaint.

I do not have any connection outside of a professional one with the defendants in the two civil suits —

Mr. Agapiou, Mr. Konal, Mr. Dion Thomas — and again, I don't have any personal knowledge of the dispute between Mr. Rockenhaus, Ms. Rockenhaus and those -- and those officers, have not read or reviewed the complaints.

As to the judicial misconduct complaint, I haven't received or been subject to any direct complaint from Mr. Rockenhaus or any of his lawyers about my conduct in this or any other case.  As I mentioned in a text order I sent out on Wednesday, I have determined from the Committee on Codes of Conduct -- I should say Judicial Conference Committee on the Codes of Conduct that guidance and an advisory opinion exists that's able to I think guide my participation in this matter.

Advisory Opinion No. 103 of the Judicial Conference Committee on Codes of Conduct is public, available to any member of the public and -- and of course me as a federal judge.  It noted that when faced with a misconduct complaint, quote, "Important reasons exist for a judge not to disqualify routinely as this would permit and might even encourage litigants to manipulate and abuse the judicial process which could undermine public confidence in the integrity of the judiciary."  Close quote.

Advisory Opinion 103 concerned an initiation of a judicial misconduct complaint by a litigant while a case that the litigant had before the complained of judge was pending. It noted, the advisory opinion in that case, that, quote,

"Recusal is unnecessary most of the time."  Close quote.

And I -- I would say the following.  Mr. Rockenhaus has not filed a complaint against me.  His wife filed a complaint against me.  The submission of a misconduct complaint against me as a judge in this case by a family member of a defendant is, in my opinion, too attenuated to create a situation where my impartiality might be reasonably questioned, and doesn't rise to the bar where the prudential concerns that I mentioned earlier — litigants who might want to manipulate or abuse a judicial process or undermine public confidence in the integrity of the judiciary — would be triggered.

If -- if Ms. Rockenhaus were in front of me, I would have a different view of things, but Mr. Rockenhaus is obviously not his wife, and I -- and I feel like my sentencing of him here subsequent to the probation violations which have been lodged should not, in balance, give the public cause about my ability to impartially resolve his -- his matter.

Now, I did, as I mentioned, receive a letter from Ms. Rockenhaus regarding her sentence or her husband's sentencing.  That's very, very common.  And it was a good letter that I've read.  I'll give it appropriate weight in my consideration of all the sentencing factors.  And I -- I fully intend to sentence Mr. Rockenhaus on the -- on the violations and the record I have before me and not based on any sort of undue reliance upon, or even consideration of, any of these

outside -- outside filings.

The -- the -- the advisory opinion advises pretty clearly that a federal judge should wait for the outcome of a misconduct complaint before engaging in sentencing, but again, that -- that -- that advice is given when a litigant files a judicial complaint.  I could certainly wait for a decision from the chief judge of the Sixth Circuit and/or the judicial conference before I sentence Mr. Rockenhaus.  I don't know what the outcome would be of that.  They might recuse me ultimately. I don't take a position on that.

But at this time I don't see a conflict or an appearance of a conflict between myself and Mr. Rockenhaus regarding any litigation that's currently in place or any judicial complaints.  Mr. Rockenhaus took responsibility for the initial violations.  He was detained as a result of violating the bond he was given in the wake of those violations, and he's been -- he's been in detention waiting for this sentencing, which I'm willing to go forward with.

But I would just ask both lawyers from the United States and the defendant's side if there are any objections based on everything I just said and the balance of the record of the case, if there's any objections with me going forward with a sentencing of Mr. Rockenhaus at this time.  Let's start with the government.

MS. LAMBERT:  The government has no objections, Your

Honor.

THE COURT:  Mr. Plotkin?

MR. PLOTKIN:  I just consulted with my client and he said he is ready to proceed based on the record.

THE COURT:  Okay.  All right.  Come on up to the microphone if you would and --

MR. PLOTKIN:  Like us to approach the podium?

THE COURT:  Yes, please.

MR. PLOTKIN:  Thank you.

THE COURT:  And we'll dispose of everything.

All right.  I gave a lengthy overview of the case. Mr. Lakin was removed.  Mr. Plotkin came in.  I -- I reviewed everything at issue in the case.  I don't need to go over that again.

Mr. Plotkin has now had time to look at the violations.  The violations are Grade C in nature, and the sentencing guideline range at the Criminal History Category in which Mr. Rockenhaus finds himself, which is III, would be five to 11 months.  Those are advisory.  And I'm happy to hear anything at this time as to sentencing, Mr. Plotkin.

MR. PLOTKIN:  Thank you.

THE COURT:  Thank you.

MR. PLOTKIN:  So obviously this is a very charged case, situation.  I was appointed by the Federal Defender Office last week; well, on the eve of the original sentencing

date.  I've lost a little track of time.

THE COURT:  Mm-hmm.

MR. PLOTKIN:  So I didn't have a chance to consult with Mr. Rockenhaus obviously that evening.  I did in the -- the lockup the following morning.  I believe that was last Tuesday.

THE COURT:  Mm-hmm.

MR. PLOTKIN:  And I encountered a very concerned, respectful — I suppose I want to highlight the word respectful — man in the lockup that I was speaking to.  And he made it clear on that first visit in the lockup, Your Honor, that he understood the four corners of this situation, and frankly his desire since I met him has been to resolve this and to make every effort to move forward --

THE COURT:  Mm-hmm.

MR. PLOTKIN:  -- with his life.

I will say that I met him again, I believe it was last Sunday, at the Milan Detention Center.  I spent I don't know if it was an hour and a half, two hours, a long period of time, and frankly Mr. Rockenhaus was very tearful and genuine in our conversations.  And I really have walked away from that particular meeting seeing I think a lot of attributes in this man that I think sadly have gotten somewhat lost more recently for various reasons.

I will say that Mr. Rockenhaus is -- well, let's go

back.  He -- and I think these are all very relevant to the sentencing today and to the 3553(a) factors.  I have -- I did send -- I believe in addition to letters, Your Honor, I believe I sent --

THE COURT:  Yes.

MR. PLOTKIN:  -- to the Court a couple documents from his --

THE COURT:  Yes.

MR. PLOTKIN:  -- regarding his discharge, and I think it's highly relevant.  We've got a man who spent from December 18th of '03 through February 25 of '15 serving the navy, serving this country.

THE COURT:  Right.

MR. PLOTKIN:  And not just serving generally.  He -- Global War on Terrorism Service Medal, Global War on Terrorism Expeditionary Medal, Armed Forces Reserve Medal, Kosovo Campaign Medal, Navy Marine Corps Achievement Medal, Letter of Commendation Flag, Combat Action Ribbon.  Well, he's given a lot to this country.  He's given a lot to try and protect our interests abroad and democracy abroad.

It left him a hundred percent disabled with a seizure disorder as a result of an IED explosion that occurred in Afghanistan.  He will live with that for the remainder of his life.  It was triggered I believe during his arrest for the supervised release arrest warrants, and that's something that

he will have to live with.  The Disabled American Veterans rating decision of '17 found that the seizure disorder is granted with a hundred percent disability, and that determination was made effective February 26th of '15, and he was ultimately discharged honorably from the separation from the service.

He's -- I think going forward, whenever the Court sees fit to allow this man to go home, I think he's going to be a positive contributor to whatever community he lives in because it was clear to me in those couple hours last Sunday how deeply concerned he is for this country.  We're going through I'll just say interesting times, not to get too politically charged today, but he's very aware and very concerned.  He's concerned about democracy here and abroad but particularly here.

He wants to get out of custody and make some kinds of positive contributions.  He does have difficulty obviously with employment.  He's a hundred percent disabled.  But he has in mind to do something, some things, whether it's employment, whether it's charitable, whether it's voluntary contributions to those causes that are so important now.

At the end of the day, I think Conrad Rockenhaus suffers a lot of trauma.  I'm sure he could benefit from continuing or at least maybe beginning or continuing counseling of some sort, Your Honor.  If I can benefit from it, there's no

question Mr. Rockenhaus can benefit from it.  And I hope he has that opportunity, whether it's through a court order or ultimately his own -- his own decision to help his mind.

I mean there's an elephant in the room and that's what the Court had laid out, but I'm here to say in my conversations with him, which, you know, again, it's been a condensed but intensified time of discussion, he's ready to move forward, he really is, and I mean that, and I mean that genuinely.  A lot of things flared up.  I wasn't there in realtime.  I have digested hundreds of pages of pleadings and allegations and whatnot.  I get what's said out there.

But more importantly, I get where Mr. Rockenhaus is coming from today.  And today he takes responsibility for his actions.  He simply, yes, wants to go home.  And I think that -- listen, I understand the violations, I understand an attitude that's looked at.  These are technical violations as they're called, and maybe he, you know, screwed up an earlier opportunity to be discharged from supervised release, but now he's spent almost a couple months in custody and not easily.

Your Honor, you know what?  I've been debating whether to bring this up and I'm going to with his permission. He got to the Milan Detention Center -- and by the way, I'm going to preface this by saying it's not the first time I've heard this, that there's a gay and trans community at the Milan Detention Center that's apparently being somewhat terrorized,

extorted, assaulted and so forth by certain inmates at the center. Mr. Rockenhaus, as many inmates do, could certainly look the other way, he could not care, it doesn't affect him. Well, it does now because he did blow the whistle, and he blew it a number of times. And I don't know whether there's any rogue correction officers involved. I've heard that for quite some time and before I ever met Mr. Rockenhaus, but he now apparently spoke up. There may or may not be retaliation. I'm hearing there is and I wouldn't be surprised.

But the reason I bring that up -- and incidentally, I've told Mr. Rockenhaus I will take his concerns to Jerome Gorgon and suggest maybe that's something that finally should be looked into. But the bottom line is I think that's an example of Mr. Rockenhaus's good character, which is he sees people in harm's way vulnerable, unable to defend themselves, and he speaks up knowing it could all turn on him because he felt it was the right thing to do. And he sat tearfully explaining this to me this past Sunday and again an hour ago in the lockup. It's very important to him and I commend him for that, and it's -- it's -- it's a sad commentary if he is getting flack for that. Okay.

DEFENDANT ROCKENHAUS: It needs to stop.

MR. PLOTKIN: And he's saying it needs to stop and I think he's correct. I only bring that in again. I think it's -- we look at the characteristics of a defendant for the

sentencing statute.  I would ask the Court to consider that.  I actually have a letter from another inmate who made a statement under oath attesting to the same allegations, which is why I'm going to convey all this to I hope the proper authorities for their consideration.

So I ask that the Court consider his background, his service, his contributions, and I think a recent contribution at the detention center, to say this man, given the opportunity to go forward with his life, will continue to feel he wants to make positive, constructive contributions to his community and ultimately to this country.  Thank you.

THE COURT:  Very good.  Thank you very much as always, Mr. Plotkin.

Mr. Rockenhaus, if you'd like to speak on your own behalf or say anything to the Court, take the mic and go right ahead.

DEFENDANT ROCKENHAUS:  Yes, Your Honor.

Your Honor, I just -- I would like to apologize to my wife because I understand that my irresponsibility caused her a lot of pain and grief in this matter.  And I -- I take responsibility for my actions, for what I've done.  And I -- I've been honored to love my country and stand by, and I -- I just -- I know all the words to "De Colores" and I'm proud to be an American.  Thank you, Your Honor.

THE COURT:  Very good.  Thank you very much.  Thank

you for your service and those words as well.

Ms. Lamb -- Lamb -- you can stay there.  Well, why don't you go ahead and sit down and -- and we can hear from Ms. Lambert.  Come on up to the podium and we'll hear what the United States Attorney would like to put on the record.  Go right ahead.

MS. LAMBERT:  Thank you, Your Honor.

As you mentioned, this is the third time we've been in court in this matter over the past couple of weeks, and in both previous sessions you spent a good deal of time discussing the record and the violations for which we are here today.  And I don't intend to go over them again in detail, but I would ask the Court -- I would ask that the Court keep them in mind and also bear with me as I highlight some of the portions of the record that I believe are relevant to the sentencing factors in order to properly support the government's recommendation today.

Your Honor, this case began years ago in the Eastern District of Texas in which the defendant was convicted of causing intentional damage to a protected computer.  The record reflects that he caused substantial damage to the computer servers of his former employer shortly after he was terminated from employment.  Then his employer, who was unaware that he had caused the damage, hired him to remediate that damage, learned that the defendant had caused the damage, and fired him

again.  And after that the defendant caused further substantial damage to that company's servers resulting in a loss of approximately $564,000.

The guideline range for that offense conduct were 78 to 97 months.  However, the defendant was sentenced to 40 months of imprisonment followed by a three-year term of supervised release, which was consistent with the terms of the parties' Plea Agreement.  The standard and special conditions of his release included, relevant here, reporting to his probation officer as directed, making restitution payments, no possession or use of a controlled substance, no new lines of credit, and no purchase, possession, contact with or use of a device that can be connected to the Internet or used to store digital materials unless approved by the U.S. Probation Office.

This court accepted transfer of jurisdiction in this matter in December of 2023, and the defendant has proceeded to violate the terms of his supervised release since then.  The record reflects that the defendant has not made a restitution payment since December 2023.  He opened seven new lines of credit without approval of his probation officer.  He tested positive for marijuana and admitted to using THC wraps.  He possessed an unauthorized cellular device, and on numerous occasions the defendant failed to report and respond to his probation officer's attempts to contact him.  Phone calls --

THE COURT:  Does he have the -- does he have the

financial wherewithal to pay restitution, because sometimes we see young men and women get in these situations in which they have a restitution order and it's just -- it's just an exercise in -- in -- in futility.  I recognize factually the correctness of your presentation on restitution, but I wonder what the whole story is or if there's more of a story that I don't know.

MS. LAMBERT:  Your Honor, it is my understanding that at one point in or around December of 2024 he had reported stable employment with his wife's company, and he also receives nearly $7,000 per month in disability compensation benefits from the Department of Veterans Affairs and from the Social Security Administration.  Despite having these -- this income, he has not made any payment since December of '23.  There are two bounced restitution payments on the record from this past summer, but he has made no other attempt that the government is aware of or that is on his record to pay any restitution or to even modify the payment amount to the extent that he might be having difficulty making a full payment.

Returning to his fail -- failure to report on numerous occasions, there were phone calls, text messages, voicemails, emails, attempted home visits, all went unanswered. At one point the probation officer was informed that the defendant was in the hospital for an extended period of time, seemingly as a reason for his nonresponsiveness.  However, the hospital has no records related to the defendant during that

time. As a result, the defendant was deemed an absconder and was subsequently arrested.

Then this past May he appeared before the Court and admitted to the aforementioned violations. And it was at this time that all of the parties — the defendant, the government, the Probation Department and this Court — agreed that the defendant deserved a second chance. That is, if he had remained compliant with his conditions of supervision, he would be sentenced to time served and released from supervision at the end of the term in September, but we are here today because that did not happen. Since then the defendant has continued to violate the terms of his release.

And before I go any further on this, I would like to clarify that the defendant has not admitted to the violations that I'm about to mention, but they are relevant to why we are here today and to his sentence in this matter.

THE COURT: Now, I take it what you're about to describe is behavior between May and today, correct?

MS. LAMBERT: Between May and today, mostly -- mostly up through August of this year.

THE COURT: Okay.

MS. LAMBERT: Before his arrest.

THE COURT: Okay. All right.

MS. LAMBERT: Yes.

THE COURT: That -- that's fine if you want to use

those materials, you know, as part of your argument.  I would like to be clear, as I'm sure you know, my sense of those behaviors were that they gave rise to the warrant and arrest that resulted in Mr. Rockenhaus's detention, and the -- the bond petition and violation was disposed of upon his arrest and the probation officers did not file additional violations for which they want him held responsible as is sometimes customary.  So what you're about to talk about is relevant to your argument in terms of the behavior of the defendant, but -- but that's about it, correct?

MS. LAMBERT:  That is correct.

THE COURT:  Okay.  All right.  Go ahead.

MS. LAMBERT:  And I will keep -- I will keep it brief.

THE COURT:  Go ahead.  No, that's fine.  Go -- go ahead.

MS. LAMBERT:  Thank you.

As I mentioned, he has still not paid any restitution despite having the income that I just mentioned.

And again, especially in August he had failed to respond to the probation officer on numerous occasions.  He had failed to update his contact information with the probation officer.  And when the officer was finally able to make contact with him, he discovered and seized two unauthorized devices in the defendant's possession and the defendant tested positive

for marijuana again. The probation officer later discovered that one of the devices had been remotely wiped clean after he seized it.

Now, Your Honor, the defendant comes before the Court at the age of 43. He does have some reported physical and mental health issues and he is a decorated navy veteran. He is well educated with a master's degree in computer and information science. These are all positive and weigh in favor of leniency.

However, he also has a very -- he has a long history of noncompliance dating all the way back to 2011 with multiple instances of failure to appear in state court, including failure to appear for a jury trial. And in this case, in the Eastern District of Texas he failed to comply with the terms of his pretrial supervision which resulted in his bond being revoked twice. This pattern of noncompliance has continued throughout this case and into his supervision.

Now, of the sentencing factors, thus far I have discussed the nature and circumstances of the offense, the defendant's history and characteristics. We've talked about restitution. But here deterrence is by far the most significant factor of all. Of course, any sentence issued today must be sufficient to deter others from violating the terms of their supervised release, but most of all it needs to deter the defendant himself.

The defendant received a second chance here to come into compliance and avoid any further proceedings.  Instead, he breached the Court's trust, and in doing so he has proven himself to be incorrigible, unsupervisable.  True, his violations are Grade C violations, one might say technical, but there are many and they were repetitive and continuous.  Again and again and again the defendant failed to follow the rules or comply with the conditions of his release, and he has done so in a manner that could be reasonably perceived as indifferent or even disdainful.

He has made it clear that there is no condition or combination of conditions with which he is willing or able to comply.  He has made it clear that he does not respect the process.  And at the end of the day, Your Honor, the only way to deter someone who doesn't respect the process is to revoke supervision and impose a custodial sentence.

So based on the record, based on the sentencing factors, it is the government's position that a custodial sentence at or near the top of the guideline range is both appropriate and necessary.  And the government would further ask that any sentence today include no further supervision and that it also include an order requiring the defendant to comply with the remainder of his restitution obligation, which is approximately $511,208.43.  Thank you.

THE COURT:  All right.  One thing before you sit

down.  I don't -- and I'm not saying this is a bad -- in fact, I'll speak to this in a minute.  But I mean once -- once the case is over, if I terminate supervised release, there's no -- there's no real governmental, how would you say it, incentive, supervision or otherwise, to pay the restitution, right?  I mean that's going to be up to Mr. Rockenhaus, right?

MS. LAMBERT:  That will indeed.

THE COURT:  Right?

MS. LAMBERT:  Yes.

THE COURT:  All right.  Okay.  All right.  Very good. All right.  Thank you.

I'm prepared to impose the sentence.

MR. PLOTKIN:  Your Honor?

THE COURT:  Come on -- come on up.  You want to respond?

MR. PLOTKIN:  Regarding restitution, I just wanted the Court --

THE COURT:  Well, stay there, you can stay there. Speak into your mic and...

MR. PLOTKIN:  Yeah, 'cuz I know the Court inherited this, so just to be clear, since rest -- and based on your question just now, when he sold his home in Texas, the government did collect approximately 52 or $53,000 which has gone toward the restitution.

THE COURT:  Okay.

MR. PLOTKIN:  Which is probably more than most, as the Court acknowledged can be done at times.

And one last thing, it's my understanding that there will be a judgment lodged against Mr. Rockenhaus that exists for 20 years, and his only way out from under that judgment is to satisfy it.  So that will be lodged against him --

THE COURT:  Okay.

MR. PLOTKIN:  -- whether or not he's on supervision or not.

THE COURT:  Okay.  Why don't you and your client stand up.  I'll impose the sentence and we'll -- we'll move -- move forward.

With regard to the 3553(a) factors, I think both lawyers summarized them accurately, and I would like to, as I generally do, give my good graces and thanks to both lawyers for excellent advocacy in a very difficult case.

Yeah, I hesitate to say this but I will because I -- I think it's relevant.  We -- we -- we have a lot of very difficult cases around here, and I imagine I've done hundreds of -- of supervised release violations in the time that I've been sitting here and I've found this one to be particularly difficult, not so much because of all the charge, as Mr. Plotkin put it, or the extraneous noise that I talked about at the beginning, but because I -- I just couldn't quite figure out why we -- we got to this point.

I'm most grateful to, cognizant of, and aware of the -- the military service and service to his country that Mr. Rockenhaus gave.  And in both here and at the guilty plea arrangement he did not present as a person who would be incorrigible or un -- unsupervisable or -- or efforting to resist the efforts to supervise his reentry, get him in a position where medically and psychologically he was able to, you know, overcome the disability diagnosis that he had and to have a fulfilling and -- and contributory vocation after his -- his prison sentence.

I am cognizant obviously, as I just mentioned, of the medical and disability factors that Mr. -- that Mr. Plotkin put forward.

I do think that Mr. Rockenhaus, based on the record I've seen here in front of me and the argument made by the Assistant United States Attorney, is unsupervisable, and I'm therefore going to revoke supervised release and not impose an additional term.

And I guess the question is then what do we do.  I mean my instinct is -- and, you know, I'd -- I'd like to send Mr. Rockenhaus home today and say that's the end, but I don't think I can do that because this is just an unbelievably lengthy period of -- of noncompliance.  And -- and to -- normally I would address it with -- and I tried frankly on May 24th or whenever we were here, I -- I tried to say I've --

you know, I've seen so many of these.  If you come in here and want to work and want to, you know, do what's necessary to get -- to get back in compliance, I'm not going to put you in jail.  But, you know, the bottom line is this went on for a long time up until May and it continued from May until August, and I -- and I think a custodial term with no further supervised release and -- and an amicable or maybe dis-amicable parting between the federal government and Mr. -- Mr. Rockenhaus is what we need to do here.

The question is how much time.  The government recommends the top of the guidelines.  The defendant's been in custody for almost two months.  I think something at the low to middle point of the guideline range is enough to say you've done wrong, you've caused a lot of trouble, but we understand that there's a big issue here.

So accordingly, six months custody, United States Bureau of Prisons, recommendation for treatment and therapy and medication to the extent it can be accomplished in such a short time, no further supervised release, and that'll be the end of the case.

Objections from the United States?

MS. LAMBERT:  No objections, Your Honor.

THE COURT:  Objections from Mr. Plotkin?

MR. PLOTKIN:  No objections, Your Honor.

THE COURT:  Okay.  Thank you very much.

Without objection, the sentence that I just stated will be imposed.

Mr. Rockenhaus, you have the right to appeal your sentence.  You can appeal your conviction if you believe your plea was unlawful or involuntary, if there's some other fundamental defect in the proceedings that was not waived by your guilty plea.  If you want to appeal your sentence, you also have a statutory right to do that under certain circumstances, particularly if you think the sentence was imposed contrary to law.

If you believe you have the right to appeal and you want to assert it, you also have the right to apply to -- for leave to appeal in forma pauperis.  The Clerk of the Court will then prepare and file a Notice of Appeal upon your request. With few exceptions, any Notice of Appeal must be filed within ten days of the entry of judgment.

The defendant's remanded to the custody of the marshal.

Both parties have copies of the presentence -- or of the violation report.  Any additional copies are to be kept strictly confidential, especially the recommendations section, as is the practice of our district.

That will be the end of the proceeding unless we have anything else from the lawyers.

But I would like to say, Mr. Rockenhaus, I don't have

any pleasure in entering a custodial sentence.  I wish you the -- the very best, but this didn't work out and I hope things do for you in the future.

Anything else from either of the lawyers?

MS. LAMBERT:  Yes, Your Honor.  I would ask that you just continue the restitution obligation on the -- on the record.

THE COURT:  Well, I mean he's got restitution until he's -- until he's terminated with supervised release and then I can't supervise the restitution, but that's part of the criminal judgment in the case so I think that's all I need to say about it, right, Mr. Plotkin?

MR. PLOTKIN:  Yeah, my -- my experience over the many years has been the federal government, that Department of U.S. Attorney's Office files the judgment.  It lasts for 20 years I believe.

THE COURT:  Yeah.  I mean there's a restitution order in the judgment out of Texas I tried to supervise during my period on the case, payment of it.  We are where we are.  Some has been made.  And again, it's going to be up to the victim and the federal government to do anything after supervision is over.  I attempted to broadcast that when I was making my comments earlier, all right?  Thank you all very much.

THE CLERK:  All rise.  Court is adjourned.

(Court in recess at 1:58 p.m.)

C E R T I F I C A T I O N

I, Linda M. Cavanagh, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code Section 753, do hereby certify that the foregoing pages 1 through 28 comprise a full, true and correct transcript taken in the matter of United States of America vs. Conrad Rockenhaus, Case No. 23-20701, on Friday, October 17, 2025.

s/Linda M. Cavanagh
Linda M. Cavanagh, CRR, RMR, RDR, CRC
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: November 24, 2025
Detroit, Michigan